IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | |
|---|---|
| Industrial Automation Supply, LLC,<br>A North Dakota limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>United Rentals Highway Technologies,<br>Inc., a Massachusetts corporation;<br>United Rentals (North America), Inc.,<br>a Delaware corporation; and United<br>Rentals Highway Technologies, L.P.,<br>a Texas limited partnership,<br><br>Defendants. | **ORDER PARTIALLY GRANTING<br>DEFENDANTS' COUNTERCLAIM**<br><br>Civil File No. 3:04-cv-99 |

**Summary of Decision**

The Court finds that the TPM-2100 tab applicator and TPM-2200 tab cutter are heavy construction equipment within the meaning of Section 51-20.1-02 of the North Dakota Century Code. The Court finds that the CSR-3000 cone setter and retriever is not heavy equipment within the meaning of the same section. The written contract between the parties is terminated by Defendants' breach, triggering the buyback provision of Section 51-20.1. The Court orders that the full cost of all unused tab applicators and tab cutters currently held in stock by United Rentals is to be applied as a set-off against the February 14, 2006 jury verdict and all unused machines are to be returned to the Plaintiff. The Court further orders that the jury award be reduced by the combined profit awarded for the TPM-2100 tab applicators and TPM-2200 tab cutters, not yet produced, but required to be purchased under the agreement in accordance with the 2003 minimum sales quota.

**Findings of Fact**

1. This action was commenced by the filing of a complaint on September 3, 2004.

2. Industrial Automation Supply, LLC ("IAS") is a North Dakota limited liability

company with its principal place of business in Fargo, North Dakota.

3. United Rentals Highway Technologies, Inc. ("United Rentals") is a Massachusetts corporation with its principal place of business in Tempe, Arizona.

4. United Rentals (North America), Inc. ("United Rentals") is a Delaware corporation with its principal place of business in Greenwich, Connecticut.

5. United Rentals Highway Technologies, L.P. ("United Rentals") is a Texas limited partnership with its principal place of business in Greenwich, Connecticut.

6. For the purposes of this litigation the Defendants appeared and litigated as a single defendant.

7. There is complete diversity between Plaintiff and Defendant.

8. The amount in controversy exceeds $75,000, exclusive of interest and costs.

9. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 and venue in this district is proper under 28 U.S.C. §1391(a).

10. IAS and United Rentals signed a "Distributor Agreement" (hereafter "Agreement") on October 4, 2002.

11. The TPM-2100 tab applicator and TPM-2200 tab cutter are both "pull-type" machinery, riding on wheels with a drawbar for towing behind another vehicle. The TPM-2100 tab applicator is used to apply adhesive reflective highway tab markers to road surfaces for temporary use during highway construction. The TPM-2200 tab cutter is used in a similar fashion for tab removal.

12. The TPM-2100 tab applicator and TPM-2200 tab cutter are primarily used in projects requiring paving, or bridge, highway, and road construction.

13. The CSR-3000 cone setter and retriever is neither self-propelled nor "pull-type" machinery. The CSR-3000 has no wheels, treads, or other means of locomotion.

14. The CSR-3000 cone setter and retriever is not primarily used in activities involving

paving, earthmoving, or bridge, road, highway, and commercial building construction.

15. The CSR-3000 cone setter and retriever places cones at regular intervals and is advertised as reducing injuries caused by repetitive physical motions.

16. The Distributor Agreement (hereafter "Agreement") between IAS and United Rentals specified that United Rentals, in exchange for sales distribution rights of IAS' RAM machinery, was to purchase and sell a specified number of RAM TPM-2100 tab applicators, TPM-2200 tab cutters, and CSR-3000 traffic cone setter and retriever systems.

17. The Agreement set forth a minimum sales quota for the respective RAM machinery for the 2002 and 2003 years.

18. The Agreement also specified that should United Rentals fail to meet the minimum quota for any of the products, United Rentals was required to purchase the remaining products to fulfill the quota for that year.

19. The minimum quota for 2002 was 10 TPM-2100 tab applicators, 10 TPM-2200 tab cutters, and 25 CSR-3000 cone machines. The minimum quota for 2003 was 100 TPM-2100 tab applicators, 100 TPM-2200 tab cutters, and 175 CSR-3000 cone setter and retriever systems.

20. United Rentals purchased the requisite number of products to satisfy the minimum quota for 2002. United Rentals currently retains some unused machinery in its inventory and uses other machines in its own highway construction business.

21. The suggested retail price of the TPM-2100 tab applicator was $33,500. The suggested retail prices for the TPM-2200 tab cutter and CSR-3000 cone setter and retriever were $14,570 and $28,600, respectively.

22. The price paid by United Rentals to IAS for the TPM-2100 was $25,000, $10,000 for the TPM-2200, and $19,675 for the CSR-3000.

23. The Agreement between IAS and United Rentals did not set forth either the cost of the equipment to United Rentals, or the suggested price for any of the equipment.

24. The Court held a jury trial in the above case, commencing on February 6, 2006, as to the issue of liability.

25. The jury found that the IAS and United Rentals had entered into a valid contract and that United Rentals had breached that contract by failing to purchase the minimum quota of RAM products for the 2003 year.

26. The jury awarded damages for breach of the Agreement in the amount of $3,273,500.

27. The only jury instructions related to a specific type of damage that were submitted to the jury was one for lost profits as damages.

28. The parties jointly requested that the counterclaim be tried to the Court.

29. The lost profit to IAS for each TPM-2100 tab applicator not sold to United Rentals is $12,500 per unit, the lost profit to IAS for each TPM-2200 tab cutter unit not sold to United Rentals is $6,500 and the lost profit to IAS for each CSR-3000 cone setter and retrieval system not sold to United Rentals is $11,075.

30. When multiplied by the number of units listed in the 2003 minimum quota, IAS' lost profits for the 2003 year were $1,250,000 for the TPM-2100 tab applicator, $650,000 for the TPM-2200 tab cutter, and $1,938,125 for the CSR-3000 cone setter and retriever.

31. Had the jury awarded the full lost profit amount for all TPM-2100 tab applicators, TPM-2200 tab cutters, and CSR-3000 required to be purchased to fulfill the 2003 minimum quota, the amount would total $3,838,125.00.

32. The jury awarded $3,273,500, or 85 percent of the full lost profit amount, for the 2003 year.

33. The share of the IAS' lost profits for the 2003 year that is subject to buyback is the sum of the total lost profits for 2003 for the TPM-2100 tab applicator and TPM-2200 tab

applicator, or $1,900,000.

34. The $1,900,000 amount that comprises the full buyback amount shall be reduced to $1,615,000, or 85 percent of the original amount, in order to reflect the jury's calculation that Plaintiff receive 85 percent of the total lost profit damages available under the contract.

35. In addition, Plaintiff must repurchase all unused tab cutters and tab setters that Defendant currently owns. The factual record indicates that a total of 11 pieces of machinery have been used by United Rentals, and three have been sold, but there is no indication as to which models comprise the unused inventory. The parties are to resolve this ambiguity and comply with the provisions of the buy-back provision forthwith.

36. The TPM-2100, TPM-2200 and CSR-3000 were priced in excess of what the market would bear.

37. Had IAS manufactured and delivered the TPM-2100, TPM-2200, and CSR-3000 to United Rentals in 2003, as specified in the Agreement, the machines could not have been readily sold in the prevailing market absent a substantial discount in the purchase price by United Rentals.

38. Once purchased, a prudent dealer would have exercised its rights under N.D.C.C. § 51-20.1 and returned the unused TPM-2100 and TPM-2200 machines to IAS under the buyback provision.

39. Requiring the manufacture and sale of equipment solely to have the machinery immediately bought back would constitute serious economic waste.

**Analysis**

In this diversity action, the Court shall apply the substantive law of the forum state.  See e.g., Engleson v. Little Falls Area Chamber of Commerce, 362 F.3d 525, 528 (8th Cir. 2004). North Dakota has adopted provisions of the Uniform Commercial Code, reflected in various provisions of the North Dakota Century Code.  North Dakota has enacted legislation for the protection of heavy equipment retailers.  Defendant contends that the provisions of N.D.C.C. Section 51-20.1-02 require a "buy back" of all unused RAM machinery sold to Defendant by Plaintiff.  Section 51-20.1-02 provides in relevant part:

> **51-20.1-02. Retail dealers may recover cost of equipment and parts upon discontinuance of contract with distributor**.  If a retailer dealer has entered into a written contract with a distributor wherein the retail dealer agrees to maintain a stock of heavy construction equipment...and either the distributor or the retail dealer desires to cancel or discontinue the contract, the distributor shall pay to the retail dealer
>
>> 1. A sum equal to one hundred percent of the net cost of all unused, complete heavy construction equipment...

The interpretation of a statute is a question of law.  Wheeler v. Gardner, 708 N.W.2d 908 (N.D. 2006); Johnson v. Nodak Mut. Ins. Co., 699 N.W.2d 45 (N.D. 2005); Reed v. Hillsboro Pub. Sch. Dist. No. 9, 477 N.W.2d 237, 240 (N.D. 1991).  In interpreting a statute, the Court's role is to give effect to the intent of the legislature.  County of Stutsman v. State Historical Soc'y, 371 N.W.2d 321, 325 (N.D. 1985).  The legislative intent, in turn, is derived from the language of the statute itself.  Id.; N.D. CENT. CODE § 1-02-02.  If the language of the statue is clear and unambiguous, the legislative intent is presumed clear from the face of the statute.  Pratt v. Altendorf, 692 N.W.2d 115 (N.D. 2005); N.D. CENT. CODE §§ 1-02-05, 1-02-39.  Here, the statute sets forth a "Definitions" section to define key words or phrases in order to eliminate any

potential ambiguity.

The language of § 51-20.1-02 immediately sets forth three requirements for applicability. First the machinery at issue must be "heavy construction equipment," or accessories therefor. Second, United Rentals must meet the definition of "retail dealer" as defined in the statute. Third, United Rentals must have agreed to maintain a stock of heavy construction equipment. All three of these elements must be satisfied in order for this "buy-back" statute to apply.

As a threshold matter, the Court must resolve the first point, whether the RAM equipment constitutes "heavy construction equipment" under the statute. The "Definitions" section of 51-20.1 provides the statutory definition of the term "Heavy Construction Equipment:"

> **51-20.1-01. Definitions**. As used in this chapter, unless the context requires otherwise:
>
> \* \* \*
>
> 2. "Heavy construction equipment" means self-propelled or pull-type construction machinery, and accessories therefor, primarily used in projects requiring paving, earthmoving, or bridge, road, highway, and commercial building construction.

Plaintiff argues that "[c]onstruction refers to an act or process of constructing" and that "[n]one of the RAM equipment is actually used in the construction process." Plaintiff maintains that the adoption of an expansive definition of construction, one that includes the RAM equipment, would also necessitate inclusion of equipment and accessories peripheral to the construction process, such as dump trucks, food carts, and hauled outhouses. The language of the statute, however, would seem to anticipate such an argument. The statute is clear in that it does not apply to any equipment that can be used in construction, or has some theoretical

application to the construction trade.  Instead, the buy-back provision applies to equipment that is **primarily used** in projects requiring paving, earthmoving, or bridge, road, highway, and commercial building construction.  Plaintiff suggests that peripheral equipment, such as food carts and portable toilets, would be considered "accessories" under an expansive reading of § 51-20.1-02.  However, such items are used in a myriad of settings, such as outdoor concerts, film shoots, rallies, state fairs, or carnivals and it cannot be said that such items, or the trucks that haul them, are "primarily used" in construction projects.  The tab applicator and cutter, by contrast, are used exclusively in road repair and construction.  Based on evidence introduced at trial the tab applicator and tab cutter were never marketed for any other purpose than setting and removing raised tabs on roadways, and Plaintiff introduced no evidence to show otherwise.  Even when viewed in an abstract, theoretical sense, it is difficult to imagine what possible uses such equipment would have outside of a road construction context.

It is important to note that this Court is not free to insert its own notions as to what constitutes "heavy construction equipment."  Instead, the Court must defer to the statute's stated meaning, as clearly set forth in the "Definitions" section of 51-20.1.  The Court reads the inclusion of this definition section as the legislature's desire to have its definition of "heavy construction equipment" override any accepted understanding this Court may derive from common parlance or from witness testimony.  Indeed, it is axiomatic that "any words explained in the [North Dakota Century] Code are to understood as thus explained."  In re Estate of Kimbrell, 697 N.W.2d 315 (N.D. 2005); N.D. CENT. CODE § 1-02-02.

The statutory definition, as read by the Court, uses the term 'heavy' not as some shorthand to describe the physical properties of the machinery, but rather to describe the primary use of the equipment - - i.e. whether the equipment is used in heavy construction activities.  In

essence, the term "heavy" serves to modify the construction activity, not the equipment itself. The definition describes the primary activities for which heavy construction equipment is used. These activities are "paving, earthmoving, or bridge, road, highway, and commercial building construction."  All of these activities are industrial or commercial nature, and stand apart from machinery one might rent to effect repairs in or around the home.  Section 51-20.1-02 describes with specificity which activities satisfy the statutory definition, which when coupled with relative opaqueness as to the acceptable physical dimensions of such equipment, can only mean that the drafters were intending that "heavy" describe the type of construction for which the equipment is used and not the physical characteristics of the machine itself.  Importantly, the only required physical attribute of "heavy construction equipment" is that they are pull-type or self-propelled.  Indeed, the statute omits any reference to required size, specific function, composition, or cost.  Thus, such attributes are irrelevant in determining whether a piece of machinery is "heavy construction equipment."

Applying the statutory definition as read by the Court, the RAM tab applicator and tab cutter are primarily used in activities, here road building and repaving, that fit the classification "heavy construction."  Moreover, both types of machinery are pulled from a truck or other transport, satisfying the self-propelled or pull type requirement of Section 51-20.1-01(2).

The cone setter/retriever, however, does not possess the required attributes set forth in Section 51-20.1-01(2). First, the RAM CSR-3000 is neither self-propelled nor is it "pull-type" equipment.  The CSR, which has no wheels or other locomotion, is fastened to the side or rear of a truck or flatbed.  In contrast, the tab applicator and tab cutter are both equipped with wheels, and are designed to be pulled and powered by a towing vehicle.  Defendant argues that Exhibits 10 and 68 show the cone setter and retriever being pulled along by a vehicle.  In actuality, such

exhibits feature the CSR-3000 mounted to an existing vehicle and suspended over the ground, again with no wheels, treads, drawbar, or independent means of locomotion.

Even if the Court were satisfied that the cone setter and retriever is self-propelled or pull-type, it still fails to meet the "heavy construction equipment" definition set forth in Section 51-20.1-01, in that it is not "primarily used" in heavy construction activities. Unlike raised tabs, which have no application outside of a highway construction context, cones can be used for a multitude of purposes, such as in crowd control or parking demarcation. An anticipated argument is that although the cones are not themselves primarily used in road construction, the machinery that sets and retrieves them is. After all, the CSR-3000's purpose is to spare a road worker from the risk of being struck by an automobile while manually placing cones. However, while the cone setter and retriever is designed to protect a highway worker, it is first and foremost a device of automation, designed to lay and retrieve cones uniformly. As such, the machine is useful, apart from its safety features, for the way in which it makes the makes the cone setting and retrieval process more accurate and more efficient. Efficiency has a ubiquitous appeal that lends itself to wide application outside the heavy construction context. The appeal of automation is also manifest in the reduction or elimination of repetitive work stress. Additionally, IAS claims on their website that the cone applicator and retriever "minimizes back injuries, workers don't need to bend over and grab cones." Therefore, it cannot be gainfully said that a cone setter or retriever is "primarily used" in heavy construction activities because of the broad scope of its potential use. Further, the Court cannot engage in a perfunctory application of Section 51-20.1-02 to the CSR-3000 on the grounds of it being an "accessory" to other heavy construction equipment. As stated above, the Court reads "primarily used in" as the legislature's attempt to exclude the types of items that have application outside of the heavy construction

process.  "Accessories" therefore, must also be primarily used in heavy construction activity, and the Court finds that, given the possible uses noted above, the CSR-3000 is a machine with potentially broad use outside the construction industry.

To resolve whether the remaining equipment is covered under the terms of the buyback provision, the Court must also determine whether United Rentals is a "retail dealer" as defined in Section 51-20.1-01.  The section reads in relevant part:

> **51-20.1-01.  Definitions**.  As used in this chapter, unless the context requires otherwise:
>
> 1.  "Distributor" means any person involved in manufacturing, wholesaling, or distributing heavy construction equipment or repair parts for heavy construction equipment, or both equipment and parts, who is authorized to, and does, enter into a written contract with a retail dealer.
>
> \*   \*   \*
>
> 4.  "Retail dealer" means every person engaged in the business of selling heavy construction equipment at retail.

The statute does not further parse the language by defining the term "retail."  Black's Law Dictionary, 7th Ed. defines "retail" as "[t]he sale of goods or commodities to ultimate consumers, as opposed to selling to those who intend to resell those items."  The definition of "retailer" likewise emphasizes the sale of goods to end users.  It reads "[a] person or entity engaged in the business of selling personal property to the public or to consumers, as opposed to selling to those who intend to resell the items."

Both parties offer to the Court disparate methods of interpreting whether United Rentals is a retail dealer.  The evidence on both sides is largely anecdotal.  IAS first points to the

nomenclature used in the contract itself, as United Rentals is referred to as a "distributor" in several parts and that even the contract itself is termed a "Distributor Agreement." The Court, however, finds this approach excessively formalistic, and largely devoid of any instructive signposts as to United Rentals' role under the contract. Indeed, the perfunctory exercise of bestowing a party with a title that is largely incongruent to their actual duties and function would directly contravene the legislature's wishes as manifest in the "Definitions" section of 51-20.1.

IAS also argues that United Rentals, having used 11 pieces of RAM equipment for their own ends, is an end user, not a retail dealer. One, however, has to look no further than the common auto dealer to see a retail dealer who regularly utilizes a limited amount of his own inventory for personal use, but still is largely engaged in the business of selling to end consumers. Similarly unpersuasive is IAS' contention that the majority of United Rentals' business is derived from non-retail sales sources. IAS itself points out that United Rentals is a large corporation with many different sources of revenue. The percentage of United Rentals' total earnings that are derived from retail sales as opposed to other operations does not concern the Court, the question is merely what was the function of United Rentals under its agreement with IAS. The Court also finds Plaintiff's critique of Defendant's sales practices not very compelling. Whether or not items are featured in catalogs, heralded in signs outside of stores, or sold at particular locations, matters little to the determination of whether an enterprise is a retail dealer, a definition which, under the definition provided by the North Dakota Century Code, includes no concomitant requirement as to how those retail goods are sold to end users. Lastly, the Court gives little to no weight to the fact that Defendant is not a member of the Association of Equipment Dealers.

Defendant asserts that the contractual duties and functions of United Rentals are the

clearest indicator of whether it is a retail dealer. Under the terms of the contract, United Rentals was required under the contract to follow up on "sales leads," was required to "market and sell," and make necessary provisions to ensure "customer satisfaction." Further, the agreement has several requirements as to how United Rentals was to "concentrate its sales force" and "sales efforts." The actual sales that United Rentals made were to end users, and the evidence introduced likewise evinces an effort to sell to construction firms and transportation agencies. As these entities would be users of the products, rather than sellers, the Court finds that the United Rentals' primary duties under the contract were the marketing and sale of RAM equipment to end users, fulfilling the definition of "retail dealer" under the statute.

The final requirement of the buyback statute is that the retail dealer, United Rentals, agreed to "maintain a stock of heavy construction equipment." To this point there can be no serious dispute. At paragraph 6 of the agreement, entitled "INVENTORY," United Rentals was required to "maintain an adequate inventory of the Products in order to satisfy the anticipated demand for the Products within the Market Area." Also, the agreement required United Rentals to "Maintain and adequate quantity of Products, at various locations within the Market Area, for demonstrations..." Plaintiff argues that had Defendant sold its quota, it had no obligation to maintain a stock fo the RAM equipment. This argument is lacking, however, in that the language of the agreement requires United Rentals to maintain a stock of equipment during the period in which it attempts to fulfill its quota. Further, there was no evidence that RAM equipment was "made-to-order," built and shipped to satisfy a single customer's order, rather, the equipment was to be sold through United Rentals' branch locations. In this manner, an inventory was required in order to satisfy customer demands. Thus, a stock of inventory was not only required under the agreement, but it was also a functional reality of the selling of RAM

equipment. The Court, therefore, finds that United Rentals agreed to maintain a stock of equipment.

## Conclusion

It is well settled that "[t]he law neither does nor requires idle acts." N.D. CENT. CODE § 31-11-05(23); <u>Weaver v. Ewers</u>, 195 F. 247, 249 (8th Cir. 1912); <u>D.E.M. v. Allickson</u>, 555 N.W.2d 596, 602 (N.D. 1996). Any remedy which would require the manufacture of unwanted and unmarketable RAM products solely to have them repurchased under Section 51-20.1-02 would constitute grave economic waste. It is a matter of hornbook law that the law of contract seeks to place the parties in the position where they would have been had no breach occurred. The law of contract remedies does not seek to award an economic windfall, but instead seeks to restore the parties to the position in which they would have been had the contract been fully performed, a fact embodied in Section 32-03-06 of the Century Code.[1]

In the instant case, it is clear from the evidence that if the contract had been fully performed the tab applicators and tab cutters would simply be excess inventory in the Defendant's possession subject to the "buy-back" provisions of the Code, as set forth above. Thus, allowing the jury's verdict to stand on profits lost on the tab applicators and cutters would constitute a windfall to the Plaintiff.

In reviewing the jury's verdict, it appears that the jury awarded nearly but not all of the lost profits sought by the Plaintiff on the tab applicators and cutters required to purchased under

---

[1]**32-03-36. Recovery not more than gained by performance.** Notwithstanding the provisions of this chapter, no person can recover a greater amount in damages for the breach of an obligation than the person could have gained by the full performance thereof on both sides, except in the cases wherein exemplary damages or penal damages are authorized, and in the case specified in section 36-21-13.

the agreement but which had not yet been built.[2]  The court finds that the maximum lost profit per tab applicator is $12,500 and the maximum lost profit per tab cutter is $6,500.  Thus, the total lost profits for the complete complement required to be purchased under the contract is $1,900,000.  Applying the same figure of 85% to this total yields $1,615,000, the amount that will be applied as an off-set against the jury's award of damages.

It is the further Order of the Court that Plaintiff repurchase all unused TPM-2100 tab setters and TPM-2200 tab removers already manufactured and currently held by Defendant.  Given the state of the record, the Court is unable to ascertain which tab cutters and applicators in the possession of the defendant have been used as the only evidence before the court is that 11 units have been placed in service.  The Court is cognizant that an order requiring the Plaintiff to actually pay the purchase price for the items subject to the buy back provisions may pose an economic hardship, thus, at the election of the Plaintiff, the parties may offset against the jury's award of damages a sum equal to the full purchase price for the items subject to the buy back provision.  The Court will stay execution on the money judgment pending a resolution of the buy-back.  If the parties are unable to come to an understanding on the exercise of the buy-back within 30 days of the entry of this Order, a hearing will be held before the Court to resolve any remaining issues.

## Conclusions of Law

1.  This Court has proper jurisdiction over this case pursuant to 28 U.S.C. §1332 and venue in this district is proper under 28 U.S.C. §1391(a).

---

[2]The jury awarded the sum of $3,273,500 which represents 85% of the full amount that would have been awarded had the jury simply multiplied IAS' profit per unit by the number of units of each type.  It appears that the jury believed that the profits sought were excessive in this small regard, a finding the Court accepts as valid.  At 85% of the lost profits for the tab applicators and cutters as required by the contract the amount to be offset against the money judgment is $1,615,000.

2. United Rentals is a "retail dealer" within the meaning of the definition provided in Section 51-20.1-01(4) of the North Dakota Century Code.

3. IAS is a "distributor" within the meaning of the definition provided in Section 51-20.1-01(1).

4. The heavy construction equipment "buy-back" provision of 51-20.1-02 is applicable as applied to the TPM-2100 tab applicator and TPM-2200 tab cutter.

5. The buy-back provision of Section 51-20.1-02 does not apply to the CSR-3000 cone setter and retriever.

6. All unused TPM-2100 tab applicators and TPM-2200 tab applicators already purchased and held in stock are also subject to the buy-back provision of Section 51-20.1-02.

**IT IS HEREBY ORDERED:**

1. The defendant's counterclaim that the TPM-2100 and TPM-2200 meet the requirements of Section 51-20.1-02 of the Century Code is valid and relief is **ORDERED** as set forth below. The defendant's counterclaim that the CSR-3000 meets the requirements of Section 51-20.1-02 of the Century Code is without merit.

2. The parties are to comply strictly with the buy back provisions of Chapter 51-20.1-02 as to any unused inventory of the TPM-2100 and TPM-2200 currently in the possession of the defendant.

3. At the election of the plaintiff, the parties may elect to offset the purchase price contemplated in the buy back against the money judgment entered upon the jury's verdict. If the parties are unable to resolve the buyback issues within 30 days of the date of this order, this

matter will come on for hearing to consideration of any unresolved issues.

    4.  The Jury Verdict awarded money damages in the amount of $3,273,500.  The defendant is entitled to an offset in the amount of $1,615,000 for the lost profits attributable for the TPM-2100 and TPM-2200 units for the reasons set forth in the opinion above.  A money judgment shall be entered in favor of the plaintiff and against the defendant in the sum of $1,658,500.

    5.  Plaintiff is required to repurchase all unused TPM-2100 tab setters and TPM-2200 tab cutters already produced and currently held in stock by Defendant.  The Plaintiff, at its election, may use the jury award to offset this amount.

    6.  All money judgments are without interest in accordance with the jury's verdict.

    7.  The court **FURTHER ORDERS** that execution by the plaintiff on the money judgment be stayed until there has been full compliance with Paragraphs 2 and 3 of the Court's Order above.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated this 8<u>th</u> day of March, 2006.

*Ralph R. Erickson*
Ralph R. Erickson, District Judge
United States District Court